The State ex rel. Kansas City v. Fred Coon et al., Judges of Circuit Court of Jackson County.

Court en Banc, February 15, 1927.

**1. OFFICER: Power to Remove.** The power to remove an officer may be absolute or conditional; it is absolute when it is vested in the unlimited discretion of the removing officer, to be exercised at such time and for such reasons as he may deem proper and sufficient; it is conditional when the time, the manner or the reason is placed beyond his mere discretion.

**2. REMOVAL: Competitive Class: Without Written Statement.** The power conferred by Section 10 of Article 15 of the 1908 Charter of Kansas City to remove a person in the competitive class of the city's civil service was not an absolute power; the delivery to the person to be removed of a written statement setting forth in detail the reasons for his removal was a condition precedent to the exercise of the power.

**3. ——: ——: Removal for Cause Only.** The power to remove at pleasure a person in the competitive class is wholly incompatible with the spirit and objectives of the civil service provisions of the 1908 Charter of Kansas City considered as a whole. The power conferred was to remove for cause only, and the cause designated was "the good of the public service."

**4. ——: ——: Copy of Statement Prerequisite to Removal.** The provision in Section 10 of Article 15 of the 1908 Charter of Kansas City that no person in the competitive class of the city's civil service shall be removed "without first having received a written statement setting forth in detail the reasons therefor" and that at the option of the person who shall have been removed "a copy of such statement shall be filed in the office of the civil service commissioners, together with the reply, if any made thereto by the person removed, and the whole shall be filed and preserved in the office of such commissioners and be open to public inspection," made the receipt of such statement a prerequisite to the exercise of the power to remove.

**5.** ————: **Illegal Removal: Remedy: Mandamus.** The Charter of 1908 contained no provision for the reinstatement of a member of the competitive class of civil service employees of Kansas City who were unlawfully removed.

**Held,** by RAGLAND, J., with whom WHITE and ATWOOD, JJ., concur, that a public remedy and a civil remedy may exist concurrently, and that where the city prescribed a remedy for the public wrong, but none for the private wrong, the common law prescribes mandamus, to compel the restoration of the member unlawfully removed, as the method of redress.

**Held,** by WALKER, J., with whom GRAVES and OTTO, JJ., concur, that there is no remedy for a right which does not exist; and as the Charter does not give to a person in the competitive class of civil service who has been unlawfully removed the right to be reinstated, and as no person has an inherent or natural or property right to an office, but only such right thereto as is guaranteed by organic law, he cannot maintain mandamus to compel his restoration.

**6.** ————: **Continuation in Office: New Charter.** The power which creates a mere legislative office may, unless expressly restrained by some specific statutory or constitutional provision, remove the incumbent, not only by abolishing the office, but by an act declaring it vacant and making provision for the selection of his successor. The provision in the new Charter of Kansas City adopted in 1925, that no person, claiming to have been unlawfully removed or discharged from the competitive class of civil service prior to its adoption, shall be restored to the office or position, did not continue such a person in office, but effectually forestalled his right to be restored thereto after its adoption.

**7.** ————: **Unlawful Removal: Salary Paid to De Facto Successor.** The agents of the city having unlawfully removed from his position a member of the competitive class of civil service, his successor, if he became a **de facto** officer, was entitled to be paid the compensation pertaining to the office during his undisputed occupancy thereof; and in such case the member unlawfully removed, although adjudged in a proper and timely suit to have been the **de jure** officer and entitled to be restored to the position, is not entitled to recover from the city the salary paid to his **de facto** successor prior to the time he brought his suit for restoration. The city having paid the salary pertaining to the office to the person apparently entitled thereto cannot be required to pay it again to the person who by suit is subsequently adjudged to be the **de jure** officer and entitled to be restored to the office. [**Per** RAGLAND, J., on motion for rehearing.]

**8.** ————: ————: ————: **Mandamus: Prohibition.** A member of the competitive class of civil service employees of the city, claiming to have been unlawfully removed in August, 1918, in January, 1923, brought a mandamus suit in the circuit court to compel his restoration and to recover the salary pertaining to the office for the time he was unlawfully deprived thereof. Thereafter three hundred other like suits were filed in different divisions of the circuit court by other persons who claimed to have been unlawfully removed from similar positions in the competitive class of civil service. employees. Thereupon, and before any of said suits had been tried, the city filed in this court its application for a writ of prohibition to prohibit all the judges of the circuit court from taking jurisdiction of said mandamus suits. The city in its petition, among other things, alleges that other persons were appointed to the positions from which the relators in the mandamus suits were removed and that they have been paid the salaries pertaining to the positions, and to compel the city to pay such salaries would be an invasion of the city's constitutional rights, and also alleges that the removals were lawful under the Charter of 1908 and the restorations are specifically prohibited by the new Charter adopted in 1925.

**Held,** by RAGLAND, J., with whom BLAIR, C. J., and WHITE and AT-
WOOD, JJ., concur, that the trial of the mandamus suits will probably
call for a construction of certain provisions of the Charter of 1908, and
the construction and constitutionality of Section 125 of the Charter of
1925 and the effect of its adoption upon the pending suits, and that the
trials will necessarily involve the truth of the allegations contained in
the petition in each case, and the sufficiency of the defenses interposed,
such as long acquiescence in the removal, estoppel and abandonment,
all of which questions lie within the competence of the circuit court to
determine, and therefore that the writ of prohibition should be dis-
charged.

**Held,** also (on motion for rehearing) that the petition for prohibition did
not sufficiently plead the defense that a payment to the de facto officers
appointed as successors of those removed relieved the city from paying
again the same salaries to those removed, if they were adjudged to be
entitled to be restored to their places, and for that further reason the
writ of prohibition should be discharged.

**Held,** by WALKER, J., dissenting, with whom GRAVES and OTTO, JJ.,
concur, that the Charter of 1908 contains no provision whatever entitl-
ing a member of the competitive class of the civil service who was un-
lawfully removed to reinstatement, and as no one has a natural or
property right to an office or to the salary pertaining thereto, the pe-
tions in the mandamus suits did not and could not state a cause of ac-
tion; and that no court has jurisdiction of a case in which the petition
on its face states facts which show that the court has not and cannot
have jurisdiction to decide it, and therefore the writ of prohibition
should be made absolute.

**Held,** by GRAVES, J., with whom WALKER, J., concurs, **first,** that while it
is not expressly pleaded in the petition for prohibition that payment to
**de facto** officers is a defense to the mandamus suits, facts are stated
from which such defense may be fairly inferred, and they are sufficient
to raise the question that a demand for a repayment would be an un-
lawful invasion of the city's constitutional rights; and, **second,** that pro-
hibition will lie and is the proper remedy in all cases where appeal, writ
of error or other remedies are wholly inadequate or would be oppres-
sive, and that to require the city to defend the three hundred mandamus
suits and then appeal would be oppressive and wrong, and prohibition is
the only adequate remedy.

Corpus Juris-Cyc. References: **Actions,** 1 C. J., Section 37, p. 944, n. 15;
Section 38, p. 945, n. 33; Section 49, p. 954, n. 80. **Constitutional Law,** 12
C. J., Section 989, p. 1213, n. 75. **Mandamus,** 38 C. J., Section 295, p. 710, n.
75. **Municipal Corporations,** 43 C. J., Section 1127, p. 677, n. 47; p. 678, n.
51; Section 1134, p. 682, n. 25. **Officers,** 29 Cyc., p. 1367, n. 42; p. 1371, n. 72;
p. 1393, n. 73; p. 1408, n. 20; p. 1409, n. 24; p. 1430, n. 99. **Prohibition,** 32
Cyc., p. 617, n. 18; p. 625, n. 70. **Remedy,** 34 Cyc., p. 1201, n. 40. **Statutes,**
36 Cyc., p. 1130, n. 69.

Prohibition.

PROVISIONAL RULE DISCHARGED.

*John T. Barker,* City Counselor, and *E. F. Halstead, Marcy K.
Brown, Jr.,* and *Wm. H. Allen,* Assistant City Counselors, for relator.

(1) The Kansas City Charter of 1908 provides for the removal
or discharge of any person in the employ of Kansas City at the
pleasure of the appointing power; no notice, trial or hearing is nec-
essary. Gregory v. Kansas City, 244 Mo. 523; Secs. 10, 31, Art. XV,
Charter 1908; State ex inf. v. Crandall, 269 Mo. 44; Magner v. St.

Louis, 179 Mo. 495; Sanders v. Kansas City, 175 Mo. App. 371; Primm, v. Carondelet, 23 Mo. 22; State ex rel. v. Davis, 44 Mo. 129; State ex inf. v. Evans, 166 Mo. 356; 23 Am. & Eng. Ency. Law, 28; 2 McQuillin's Mun. Corp., sec. 558.    (2) The Kansas City Charter of 1908 provides a plain, speedy and adequate remedy for one removed from office and such remedy is exclusive.    Such discharged person has no right to restoration to office or the recovery of any salary after his discharge.    His remedy is the removal or prosecution of such discharging official, if the power of removal was abused. Secs. 10, 31, Art. XV, Charter 1908; Globe Newspaper Co. v. Walker, 210 U. S. 365; Kieffer v. Oil Co., 9 Fed. (2d Ser.) 263; Carlisle v. Ry. Co., 168 Mo. 656; Osagera v. Schaff, 293 Mo. 344; Chandler v. Railroad, 261 Mo. 600; City v. Dasher, 120 Mo. 680; Markowitz v. City, 125 Mo. 485; State ex rel. v. Hughes, 240 S. W. 805; Chicago v. O'Connell, 8 A. L. R. 929; 1 C. J. 989, 991; 36 Cyc. 1175; Yates v. National Bank, 206 U. S. 158; National Bank v. Dearing, 91 U. S. 29; Stanton v. Thompson, 234 Mo. 7; Coal Co. v. George, 233 U. S. 359; In the Harrisburg, 119 U. S. 199; In Haycraft, 22 Wall. 81, 98; Pollard v. Baily, 20 Wall. 520; Bank v. Railroad, 197 U. S. 394; Black on Interpretation of Laws, sec. 98.    (3) Laws regarding the removal of city employees are not for the benefit of such employees but are for the public good; an office is not the property of the officeholder, but is a public trust or agency.    Sanders v. Kansas City, 175 Mo. App. 371; 23 Am. & Eng. Ency. Law, 328; Mechem's Public Officers, sec. 464; 2 McQuillin's Mun. Corp., sec. 494.    (4) No employee has a vested right to an office or position.    His employment may be terminated at any time.    Gregory v. Kansas City, 244 Mo. 548; Primm v. Carondelet, 23 Mo. 22; State ex rel. v. Davis, 44 Mo. 129; State ex inf. v. Evans, 166 Mo. 347; Sanders v. Kansas City, 175 Mo. App. 367; Taylor v. Beckham, 178 U. S. 577; 23 Am. & Eng. Ency Law, 328; 29 Cyc. 1415, 1367; 22 R. C. L. 580.    (5) There can be no restoration to office or recovery of salary by discharged employees under the Kansas City Charter of 1908.    Secs. 10, 31, Art. XV, Charter 1908; Gregory v. Kansas City, 244 Mo. 547. (6)    Prohibition is not only the proper remedy, it is the only remedy.    More than three hundred suits are pending against Kansas City; the amount claimed is in excess of three million dollars.    Salaries are accruing at the rate of two thousand dollars per day.    The remedy by appeal is impracticable.    No restoration is provided for in the Charter of 1908 and the circuit court is asked to render a judgment which it cannot render.    State ex rel. Orr v. Latshaw, 291 Mo. 592; State ex rel. v. McQuillin, 246 Mo. 532; State ex rel. v. Buckner, 203 S. W. 243; State ex rel. v. Eby, 170 Mo. 526; State ex rel. v. Jones, 274 Mo. 374; Stafford v. Wallace, 258 U. S. 495: Railroad v. Tucker, 230 U. S. 340; Ex parte Lange, 18 Wall. 163;

12 Am. & Eng. Ency. Law, 1470; Elliott v. Peirsol, 7 L. Ed. 164; Windsor v. McVeigh, 93 U. S. 282; 32 Cyc. 617; 22 R. C. L. 10, 11, 21.

*John I. Williamson, John G. Park* and *Darius A. Brown* for respondent.

(1)   Under the conceded facts in this record and the well-settled law of this State the issuance of the writ of prohibition is not authorized or warranted in this case.   State ex rel. v. Mills, 231 Mo. 500; State ex rel. Burns v. Shain, 248 S. W. 593; State ex rel. Davis v. Ellison, 208 S. W. 439; Scarritt Estate Co. v. Johnson, 262 S. W. 377; State ex rel. v. Muench, 225 Mo. 222; State ex rel. Orr v. Latshaw, 291 Mo. 592; State ex rel. v. McQuillin, 246 Mo. 532; 23 Am. & Eng. Ency. Law, 200, 201; Elliott v. Peirsol, 1 Pet. 340; Windsor v. McVeigh, 93 U. S. 282; 32 Cyc. 617; 22 R. C. L. sec. 9, p. 10.   (2) The 1908 Charter does not permit removals at pleasure and notice and hearing are necessary.   Secs. 10, 25, Art. 15, Charter 1908; State ex rel. Denison v. St. Louis, 90 Mo. 19; State ex rel. Reid v. Walbridge, 119 Mo. 394; State ex rel. Chapman v. Walbridge, 153 Mo. 194; State ex rel. Hamilton v. Kansas City, 259 S. W. 1045; State ex rel. Prior v. Kansas City, 261 S. W. 112; State ex rel. Langford v. Kansas City, 261 S. W. 117; State ex rel. Stomp v. Kansas City, 281 S. W. 426; State ex rel. Rundberg v. Kansas City, 226 S. W. 988; State ex rel. Rawlings v. Kansas City, 250 S. W. 927; State ex rel. Eckles v. Kansas City, 257 S. W. 197; State ex rel. Leader v. Kansas City, 258 S. W. 762; State ex rel. Wingfield v. Kansas City, 263 S. W. 516; State ex rel. Zaner v. Kansas City, 263 S. W. 521; Windsor v. McVeigh, 93 U. S. 274; Hovey v. Elliott, 167 U. S. 409; Terrell v. Allison, 21 Wall. (U. S.) 289; State ex rel. Henson v. Sheppard, 192 Mo. 497; 12 C. J. 1234, sec. 1009; 29 Cyc. 1415, 1417; 38 C. J. 713, sec. 303; 709, sec. 295; State ex rel. v. Miles, 210 Mo. 127; Secs. 7061, 7063, 7065, 8861, 9168, R. S. 1919; Sec. 461, 1925 Charter; State ex rel. v. County Court, 53 Mo. 128; State ex rel. Mosconi v. Maroney, 191 Mo. 531, 547; Gracey v. St. Louis, 213 Mo. 384; 23 Am. & Eng. Ency. Law (2 Ed.) 437; Sec. 5, Art. 14, Mo. Constitution; Gregory v. Kansas City, 244 Mo. 545; Sections 9174, 9175, 9183 to 9198, R. S. 1919; Throop on Public Officers (1892 Ed.) sec. 351, p. 356; Field v. Comm., 32 Pa. St. 478; Mechem on Public Officers, sec. 452, p. 286.   (3)   Relator asserts that under the 1908 Charter one unlawfully removed was not entitled to restoration.   The law is otherwise.   State ex rel. Chapman v. Walbridge, 153 Mo. 194; Gracey v. St. Louis, 213 Mo. 384; State ex rel. Hamilton v. Kansas City, 259 S. W. 1052; State ex rel. Langford v. Kansas City, 261 S. W. 117; Bates v. St. Louis, 153 Mo. 18; State ex rel. Henson v. Sheppard, 192 Mo. 497; State ex rel. Rundberg v. Kansas

City, 226 S. W. 989; State ex rel. Stomp v. Kansas City, 281 S. W. 426; Gregory v. Kansas City, 244 Mo. 545. (4) Notice and hearing are necessary and mandamus is the remedy. Cases above. State ex rel. Eckles v. Kansas City, 257 S. W. 197; State ex rel. Leader v. Kansas City, 258 S. W. 762; State ex rel. Wingfield v. Kansas City, 263 S. W. 517; State ex rel. Zahner v. Kansas City, 263 S. W. 521. (5) Under the 1908 charter and the general law of the land civil service employees acquired certain rights which cannot be divested otherwise than as in that charter and law provided. Their pending actions were not affected by the adoption of the new charter. Secs. 10, 25, Art. 15, 1908 Charter; Gregory v. Kansas City, 244 Mo. 523; cases above.

RAGLAND, J.—This is an original proceeding in prohibition. The pleadings in the case, the petition, return and reply, disclose the following facts:

On or about June 11, 1923, one Dee Pickett, filed in the Circuit Court of Jackson County a petition in mandamus entitled: "State of Missouri at the Relation of Dee Pickett, Relator, v. Kansas City, Missouri, a municipal corporation; William Buchholz, George H. Edwards and Hughes Bryant, as members of the Board of Fire and Water Commissioners of Kansas City, Missouri; James B. Shoemaker, as Assessor & Collector of Water Rates; Clarence I. Spellman, J. S. Adsit and Irving Smith, as members of the Board of Civil Service; George E. Kimball, as City Comptroller; Ben Jaudon, as City Treasurer; Eugene H. Blake, as City Auditor; and Albert I. Beach, as Mayor of Kansas City, Missouri, Defendants—No. 186979." The petition as subsequently amended, omitting caption and signature was as follows:

"1. The petition of Dee Pickett respectfully represents that he is now and for many years last past has been a citizen and resident of Kansas City, Jackson County, Missouri; that defendant Kansas City, was and is a municipal corporation duly organized and existing according to the laws of Missouri and having a special charter adopted pursuant to the provisions of the Constitution of Missouri; that defendants have for some time been and still are the duly appointed (or elected) qualified and acting members of administrative boards created by the charter and ordinances thereof or officers of said city as classified in the caption.

"2. Ordinance of Kansas City, numbered 6619, approved October 17, 1910, entitled 'an ordinance concurring in and approving a general schedule of the number, grade and compensation of the officers, agents and employees of the water department' approved a resolution of said Board of Fire & Water Commissioners, which among other things provided for the position of mail clerk at a salary

316 Mo.—34.

of $1140 per annum; Ordinance No. 29845, approved June 19, 1917, entitled as aforesaid, provided for the position of general clerk at a salary of $1200 per annum; by Ordinance 32569, approved March 19, 1918, said salary was increased to $1400 per annum, and by ordinance numbered 33235, approved June 18, 1918, entitled as aforesaid, said salary was increased to $1500 per annum. Said compensation was by Ordinance No. 38228, approved July 16, 1920, entitled as aforesaid, increased to $1620, and by Ordinance No. 45535, approved May 26, 1923, entitled as aforesaid, to $1800 per annum. Said positions according to the provisions and requirements of said Article 15 of the City Charter were and are in the competitive class of the city's service; that Section 10 of said Article 15 of the City Charter, provided, among other things, 'No person in the city service shall be removed, reduced in grade or salary, or transferred because of political or religious beliefs or opinions of such person; nor shall any person in the competitive class of the city's service be removed, reduced in grade or salary, or transferred without first having received a written statement setting forth in detail the reasons therefor.'

''3. On or about March 15, 1911, the Board of Civil Service pursuant to and in conformity with said Article 15 of the Charter of Kansas City and the rules and regulations of said board, held an examination for the position of mail clerk; relator appeared and underwent said examination and received a rating by said Board of Civil Service of 80.05 per cent; that thereafter on or about March 24, 1911, said Board of Civil Service notified your petitioner that he had received said rating and that same entitled him to second place on the eligible list for said position. In response to requisition from the then assessor and collector of water rates, on or about July 20, 1920 [1911?], said Board of Civil Service certified relator's name to the then appointed, qualified and acting assessor and collector of water rates for appointment to said position. That on or about July 20, 1920 [1911?], the then assessor and collector of water rates appointed relator to said position and relator immediately entered upon the performance of the duties thereof and continued to perform said duties and receive the salary provided therefore until on or about October 1, 1914.

''On October 1, 1914, relator was promoted to the position of meter ledger clerk, collection division, at said salary of $1200, in which position he served until June 27, 1917, when in accordance with charter and the regulations of the Board of Civil Service he was transferred to the position of general clerk, collection division, in which position he served until on or about August 15, 1918.

''That said salary was paid to relator in semi-monthly installments in the following manner: The name of relator and the amount of

his salary for one-half month, with those of other officers and employees of said department, were placed upon a pay roll prepared and certified by or under the direction of the said board and the assessor and collector, whereupon said pay roll, together with a requisition prepared by or under the direction of said board and said. assessor and collector, was delivered to the city auditor of Kansas City, requiring him to draw warrants on the city treasurer of said city in payment of the said salaries, was presented by or under the direction of said board and said assessor and collector to the comptroller of said city, who, after procuring the endorsement upon said pay roll of the Board of Civil Service of Kansas City, Missouri, presented same to the city auditor, who in accordance with said requisition drew his warrants on the city treasurer to the several persons and for the several amounts named in said pay roll; said comptroller then countersigned said warrants and registered them in his office, and delivered them to the city auditor, who delivered them to the persons named therein; said warrants were then presented to and paid by the city treasurer to the proper holders thereof.

"4. On or about August 15, 1918, while relator was in lawful and peaceable possession of said position and employment and while faithfully discharging the duties thereof, the then assessor and collector, without first having delivered to relator a written statement setting forth in detail the reason therefor, without giving relator a hearing or any opportunity to be heard, attempted to discharge relator from his said position of general clerk, collection division, and notified relator that he was removed therefrom to take effect on August 15, 1918. That said officer shortly thereafter assuming to appoint a successor to your relator, unlawfully placed another person in charge of said position or employment and has ever since excluded relator from his said position or employment and has refused to allow him to perform the duties thereof, and that each and all of the other defendants and their predecessors have refused and still refuse to recognize relator as general clerk, collection division, or to allow relator's name to be placed upon the pay roll or to take any steps leading to the payment of relator's salary or any part thereof, and that relator has received no part of his salary after August 15, 1918.

"5. The said attempt to discharge and exclude relator from his position was in direct violation of the express provisions of the Charter of Kansas City and the law of the State of Missouri in this to-wit: That relator was never furnished by any officer, agent or employee of the city with a written statement setting forth in detail the reason for the said attempted discharge and relator was attempted to be removed and discharged because of political beliefs or opinions, and without giving to relator any hearing or opportunity to

be heard, touching the right or power to remove or his faithfulness or unfaithfulness in the service.

"6. Notwithstanding said attempted removal, relator still is the duly and legally appointed and qualified general clerk, collection division, and legally entitled to perform the duties thereof and receive the salary therefor.

"7. Immediately after notice of said attempted removal relator demanded of the said assessor and collector that relator be immediately reinstated and recognized as general clerk, collection division, and prior to institution of proceedings caused to be served upon all defendants or their predecessors in office a demand for restoration to said position, and for the relief herein prayed, but defendants and their predecessors have refused to take any steps to restore relator to his position or afford the relief prayed, although he was clearly entitled thereto.

"Wherefore, relator prays that this court award a writ of mandamus commanding defendants, the members of the Board of Fire and Water Commissioners of Kansas City, Missouri, or their successors, and defendant, the Assessor and Collector of Water Rates, of Kansas City, Missouri, or his successor, without further excuse or delay, to restore relator to said position and reinstate relator's name upon the pay roll of the water department from and after the date of said unlawful discharge, to-wit, August 15, 1918, until relator shall have been actually restored to said position and certify the same to the City Comptroller with their requisition upon the City Auditor to prepare warrant for relator's said salary and to recognize relator as the lawful general clerk, collection division, Water Department of Kansas City, Missouri; commanding defendant Comptroller, or his successor, to approve said pay roll and to present same to the City Auditor, or his successor, and to said Board of Civil Service Commissioners, or their successors, for their endorsement; commanding defendant, said Board of Civil Service Commissioners or their successors to endorse said pay roll, commanding defendant City Auditor or his successor to draw warrant in favor of relator for such salary, commanding said Comptroller, or his successor, to countersign said warrant and deliver same to the City Auditor, commanding said City Auditor to deliver same to relator and commanding said City Treasurer or his successor to pay said warrant when presented. Relator further prays for recovery of costs."

The suit in which said petition was filed was pending on February 24, 1925, the date on which a new charter was adopted by Kansas City and the date on which certain sections thereof, including Section 125, became effective; and it was still pending on April 10, 1926, when the charter as a whole went into effect. After the date last mentioned the plaintiffs in said suit (which will hereafter be

designated as the Pickett case) filed a motion in the division of the circuit court in which the cause was pending, asking that the incumbents of offices under the new charter, who by the terms of the administrative code enacted pursuant to the provisions of such charter are declared to be the successors and to succeed to the duties of .the officers originally named as defendants, be substituted, in their official capacities, as parties defendant. The motion was sustained and the substitution accordingly made. Thereupon, on the 22nd day of May, 1926, defendant Kansas City (as relator) filed in this court its.petition in prohibition.

Relator alleged in its petition, among other things:

"That the respondents constitute the entire Circuit Court of Jackson County, Missouri; that O. A. Lucas is the judge of division number two and acting as the presiding judge of such court, with the power to transfer and assign cases to other divisions of the court under the rules of such court; that more than three hundred mandamus suits are now pending in all the divisions of such court against Kansas City, asking that the plaintiffs therein be restored and reinstated to the positions held by them prior to their ·discharge, and for the salaries attaching to such positions; that respondents have assumed jurisdiction of all of the said cases and are proceeding to hear and determine same; that all of said mandamus suits raise the same questions, that is, the right to restoration and the recovery of the salaries under the old charter of 1908 which has been repealed; that . . . unless this court issues its preliminary rule in prohibition respondents and each of them will proceed with said cases and will render judgment of restoration and allow such plaintiffs to recover salaries up to the date of such restoration."

Our provisional rule issued as prayed.

The grounds upon which relator bases its claim for relief in prohibition are set forth in its petition repetitiously and somewhat argumentatively, but they may be epitomized and grouped as follows:

(1) Under Section 10 of Article 15, of the Kansas City Charter of 1908, a person in the competitive class of the classified service of the city could be removed or discharged without notice, trial or hearing, ·and if such person were wrongfully removed or discharged, neither Section 10 nor any other provision of the charter provided for his reinstatement. Said Section 10 provided that if any officer, board, head of department or other person having power to discharge, abused such power, such officer, board, head of department or person should be subject to removal; and Section 31 of said Article 15 provided that any person who wilfully, or through culpable negligence, violated any of the provisions of that article should be deemed guilty of a misdemeanor and upon conviction be punished by fine or imprisonment or both. These provisions of the Charter of

1908 constituted the sole remedy available to a person in the competitive class of the civil service who was wrongfully dismissed from the service.

(2) "After the adoption of Section 125 of the new charter, effective on the 24th day of February, 1925, and after the adoption of the charter as a whole, effective on the 10th day of April, 1926, the said Dee Pickett was and is not entitled to be restored to the office claimed by him, because the remedy in mandamus, if ever available, was taken away from him upon the adoption of such new charter."

(3) "Dee Pickett and other discharged civil service employees rendered no service to the city after such discharge, but the city employed others who performed their work and were paid therefor; . . . to now compel such city to pay the said Dee Pickett and others is in violation of Section 20 of Article II of the Constitution of Missouri, and deprives relator of its property without due process of law; and is in violation of Sections 46 and 47 of Article IV of the Constitution of Missouri, and constitutes a gift or gratuity paid to the said Dee Pickett and others; and is in violation of Section 48, Article IV, of the Constitution of Missouri, in allowing the said Dee Pickett and others extra compensation after service is rendered; and is in violation of Section 3 of Article X of the Constitution of Missouri, which provides that taxes may be collected only for public purposes. and if payment be made to such discharged civil service employees, such taxes so collected are used for purposes other than public purposes; and in violation of Section 1, Article XIV, of the. Amendments to the Constitution of the United States in that it deprives relator of its property without due process and is an unlawful discrimination and denies the equal protections of the law and abridges the privileges and immunities of relator."

(4) "By virtue of the great number of suits and the accumulation of salaries each day amounting to more than two thousand dollars, if there be accumulations, prohibition is the only remedy by which such matters may be determined; and relator has no adequate remedy at law."

In their return respondents aver, *inter alia*,

"That they have jurisdiction and it is their duty to hear, determine and decide said contentions, and all other contentions arising in said causes, according to the evidence adduced and the law applicable thereto, as and when said suits of Pickett and others in the same situation shall properly come on for hearing before respondents, and aver that they have not determined or decided anything in said causes arbitrarily; . . . that all the questions aforesaid are within their proper jurisdiction, and they deny that they are usurping or improperly exercising jurisdiction."

I. A consideration of the matters set out in the preceding state-

**Power to Remove.**

ment as group "(1)," which relator alleges entitle it to the remedy of prohibition, calls for a consideration of Section 10, Article 15, of the Charter of 1908. Certain related provisions should be first noted.

Section 3 of Article 15 divides the civil service of the city into the "exempt service" and the "classified service."

Section 4 designates the officers who comprise the exempt class; all officers elected by the people; the sergeant at arms of the common council or either house thereof; the mayor's secretary and the mayor's stenographer; the city auditor; the city counselor; the city clerk; the city assessor; the city comptroller; the city treasurer; their deputies and assistants; the members of certain boards, such as the board of public works; and a few others specifically named.

Section 5 provides: "The classified service shall comprise all officers and positions in the city service not specifically designated in the exempt service, and shall be arranged in two classes to be designated respectively as the competitive class and labor class."

Section 6 defines the competitive class as including all positions in each and every branch of the civil service of the city, except such as are in the exempt service or in the labor class. Under Section 8 the labor class includes "unskilled laborers and such skilled laborers as may be so classified by the rules and regulations of the [civil service] commission."

Section 10 deals with the power of removal. The portions relevant to the present consideration are as follows:

(a) ". . . heads of departments shall respectively have power to remove or discharge any person holding any office, position, or employment in their respective departments whenever, in their opinion, the good of the public service requires the exercise of such power.

(b) "It shall be the duty of a discharging officer, upon request of a discharged person, at any time after discharge, to give such person a correct statement in writing of the reasons for his discharge.

(c) "No person in the city's service shall be removed, reduced in grade or salary, or transferred because of political or religious beliefs or opinions of such person;

(d) "nor shall any person in the competitive class of the city service be removed, reduced in grade or salary or transferred without first having received a written statement setting forth in detail the reasons therefor."

Clause "a" confers in broad and general terms the power of removal. It carries with it an implied limitation on that power, namely, that it should be exercised only when, in the opinion of the officer having the power to remove or discharge, "the good of the public service" requires it to be. In the succeeding clauses there are

two, and only two, limitations on the power.   These are express. Clause ''c,'' ''no person in the city service'' shall be removed, etc., because of political or religious beliefs; and ''d,'' ''nor shall any person in the competitive class'' be removed, etc., ''without first having received a written statement setting forth in detail the reasons therefor.''   Clause ''c,'' is of general application, comprehending all persons in the city's service in its limitation of the power to remove them; clause ''d'' is by its own terms restricted in its application to the removal of persons in the ''competitive class.''   Clause ''b'' is in no respect a limitation on the power of removal.   It merely requires that the discharging officer give the person discharged, at any time *after* discharge, a statement in writing of the reasons for his discharge.   It was held in State ex rel. Hamilton v. Kansas City, 303 Mo. 50, 66, that this clause, in the use of the word ''discharge,'' was applicable only to the labor class.   An employee is *discharged;* but an officer is *removed*.   But if that is not the correct interpretation, the clause is general in its application, comprehending both the labor class and the competitive class; and if there is any repugnancy between it and clause ''d,'' the latter must prevail.   ''When there is in the same statute a particular enactment, and also a general one which in its most comprehensive sense would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment. . . . the particular specified intent on the part of the Legislature overrules the general intent incompatible with the specific one.''   [25 R. C. L. p. 1010, sec. 250.]   This rule of construction is one of universal recognition.   [McGrew v. Railroad, 230 Mo. 496, 524; State ex rel. v. Foster, 187 Mo. 590, 610; Jaicks v. Merrill, 201 Mo. 91, 106; 36 Cyc. p. 1130, sec. C.]

The power to remove an officer, like the power to appoint, may be absolute or conditional.   It is absolute when it is vested in the unlimited discretion of the removing officer to be exercised at such time and for such reasons as he may deem proper and sufficient.   It is conditional when the time, the manner or the reason is placed beyond the mere discretion of the removing officer.   When conditional, the power must be pursued with strictness; it can be exercised only in the manner and upon the conditions fixed.   [Mechem's Public Officers (1890 Ed.) secs. 448, 450.]   From the analysis just made of Section 10, Article 15, of the 1908 Charter, it is plain that the power to remove a person in the competitive class of the city service which was therein and thereby conferred was not an absolute power. Clause ''d'' in express terms provided: ''Nor shall any person in the competitive class of the city service be removed . . . without *first* having received a written statement setting forth in detail the

reasons therefor.'' The delivery of such written statement was therefore a condition precedent to the exercise of the power. Until that condition had been complied with the power to remove a person in the competitive class of the city service did not exist. [State ex rel. Hamilton v. Kansas City, supra; State ex rel. Prior v. Kansas City, 261 S. W. 112; State ex rel. Stomp v. Kansas City, 281 S. W. 426.]

It is said that the power conferred by Section 10 was either a power to remove ''at pleasure,'' or a power to remove ''for cause.'' If this text-book classification must be made, then we have no hesitation in holding that it was a power to remove for cause only. And that cause was the failure of the incumbent of an office to make the performance of his duties measure up to the requirement designated as ''the good of the public service.'' The power to remove at pleasure is wholly incompatible with the spirit and the objectives of the civil service provisions of the Charter considered as a whole.

Following the prohibition that no person in the competitive class of the city's service could be removed without first having received a written statement, setting forth in detail the reasons therefor, Section 10 provided as follows: ''and at the option of the person who shall have been removed  . . .  a copy of such statement shall be filed in the office of the civil service commissioners, together with the reply, if any made thereto by the person removed, and the whole shall be filed and preserved in the office of such commissioners and be open to public inspection.'' It is said that in view of this last provision it is clear that it was not contemplated that the written statement setting forth the reasons for removal should be the basis of a hearing and removal for cause, because it was therein provided that the statement and reply thereto should be filed in the office of the civil service commissioners *after* the removal. It is not necessary to hold that the framers of the Charter intended that the written statement of reasons for removal of an incumbent should be in the nature of charges of misconduct or inefficiency, with respect to which he should be accorded a hearing and an opportunity to defend. They may have considered that the requirement that an officer having power to remove a person in the competitive class should give such person a written statement in writing setting forth in detail the reasons for the removal  before removing him, which might be filed in the civil service commissioners' office and there be subject to public inspection, would operate as an adequate restraint against illegal removals; for such a statement might be made the basis of a criminal prosecution against a guilty removing officer, or of a proceeding to remove *him* from office. But whatever the purpose may have been in providing that no incumbent of an office in the competitive class should be removed without first receiving the specified written statement, it is

unquestionable that the receipt of such a statement was made, by the express language of the provision, a prerequisite to the exercise of the power to remove. And that is the phase of the matter which alone concerns us in this proceeding.

The plaintiff in the Pickett case, according to the allegations of his petition which for the purpose in hand we assume to be true, never received a written statement setting forth in detail the reasons for his removal. He was therefore never removed, at least until the adoption of the Charter of 1925, the effect of which we will consider in a subsequent paragraph. [Gracey v. St. Louis, 213 Mo. 397.] Notwithstanding he continued to be a *de jure* officer, he was by the attempted removal deprived of the physical possession of his office and the emoluments which were incident to the office.

"It does not follow because a public office created by law is not property in a precise sense, that a duly elected (or appointed) incumbent is at the whimsical sport of chance, caprice or of intermeddlers or of any form of illegal and unauthorized interference. **Remedy.** . . . 'An office has a pecuniary value, although primarily it is an agency for public purposes.' So that, given that one but 'reads his title clear to' a public office, he may not be rudely cast out from its *solatium*, its emoluments, except on due process and by the rigor of penalties denounced by positive law." [State ex rel. v. Sheppard, 192 Mo. 509-510.]

Relator asserts that Pickett cannot be restored to that of which he was unlawfully deprived because the Charter of 1908 did not so provide. "It is written on the hornbook of the law, that the public and a party particularly aggrieved, may each have a distinct but concurrent remedy for an act which happens to be both a public and a private wrong." [Foster v. Commonwealth, 8 Watts & S. 79.] The Charter prescribed a remedy for the public wrong; but because none was provided for the private wrong, it does not follow that one does not exist. In such case the common-law method of redress is impliedly given. [Endlich on Interpretation of Stats., secs. 463, 464.] That method is mandamus. [State ex rel. v. Miles, 210 Mo. 172; State ex rel. v. Walbridge, 153 Mo. 194; Spelling on Injunctions (2 Ed.) sec. 1576; 26 Cyc. 260.]

A remedy is said to be the means employed to enforce a right or redress an injury. [Bouv. Dict.] "When . . . primary rights and duties are public, that is, when they govern the relations alone of the State with individuals, the remedies for the violation thereof are public, and the larger portion of them are criminal. When the primary rights and duties are private, that is, when they are confined to relations of individuals with each other, the remedies are also private, or, as they are frequently termed, civil." [Pomeroy, Code

Remedies, sec. 3, page 3.]   As already noted, it is hornbook law that
a public remedy and a civil remedy, with reference to the same
wrongful act, may exist concurrently.  The Charter of 1908 declared
that an officer, having the power to remove, who removed a person
in the competitive class of the civil service, in violation of charter
provisions, should be subject to removal himself as well as to crimi-
nal prosecution.  There is no intimation in any of the language used
in that connection that the removal or prosecution of a guilty remov-
ing officer was intended as a ''redress'' of the individual injury that
would be suffered by the officer unlawfully removed.  How it could
so operate is past understanding.

The construction placed upon Section 10, Article 15, of the Charter
of 1908 in the foregoing paragraphs is not new.  What is there said
has been said before, and said more forcefully, in the well-considered
opinion written by LINDSAY, C., in State ex rel. Hamilton v. Kansas
City, supra, concurred in by all of the judges of Division One.  The
Hamilton case was followed in State ex rel. Prior v. Kansas City,
supra, also decided by Division One; and it received express recog-
nition and approval by Court en Banc in State ex rel. Stomp v.
Kansas City, supra.

Nor is there any conflict between the cases just cited and Gregory
v. Kansas City, 244 Mo. 534, as relator insists.  In the latter case it
was said:

''Section 10, Article 15, of said new charter, like Section 1176 of
the Revised Ordinance of 1898, expressly prohibits the removal, re-
duction in grade or salary or transfer of any employee because of
political or religious belief or opinions; in fact, said charter ampli-
fies and extends those civil service rules contained in Section 1176,
supra, and applies them to all persons employed by the city.  It does
not stop at employees of the waterworks department.  It expressly
protects appointees in the competitive class of the civil service by
requiring notice of their intended removal and the reasons therefor,
as well as other safeguards for their protection; but the Charter
conflicts with Section 1176, supra, in that it does not permit the dis-
charged employees to be reinstated by a trial conducted by certain
officers of the city.

''The charter is a little vague, but seems to provide that before any
civil service employee shall be discharged, the cause for which he is
to be removed shall be investigated by the person authorized to dis-
charge him, and the reason for his removal designated in the notice
which the employee must receive before he can be discharged.''

Now that language must be construed with reference to the matter
that was before the court for determination.  The question then being
considered was whether Section 1176, Revised Ordinance of 1898
(which provided for a hearing before certain executive officers of the

city in cases of removal of civil service employees, and for their rein-statement, if found to have been wrongfully removed), was repealed by the adoption of the Charter of 1908. Whether the provisions of Section 10, Article 15, of that charter made the receipt by a civil service employee of the written statement therein specified a condi-tion precedent to his removal was not under consideration and was in no wise involved. It could be true, that "the Charter [of 1908] conflicts with Section 1176, supra, in that it does not permit the dis-charged employees to be reinstated by a trial conducted by certain officers of the city;" and equally true, "that before any civil service employee shall be discharged, the cause for which he is to be removed shall be investigated by the person authorized to discharge him, and the reason for his removal designated in the notice which the em-ployee must receive *before he can be discharged.*" The fact that the Charter did not provide for the reinstatement of illegally removed officers is, as we have endeavored to show elsewhere in this opinion, wholly without influence on the question of the power to remove.

II. "The universal rule is that, unless otherwise directed by the new act, the officers go out with the charter under which they held, and the officers under the new charter take their places whether under the same or a different name." [Commonwealth v. **Accrued** Moir, 199 Pa. 534, 549.] It is claimed by Pickett and the **Rights.** plaintiffs in cases similar to his now pending in the Cir-cuit Court of Jackson County that the offices which they respectively held under the Charter of 1908 were continued, and under the same names, in the 1925 Charter. Whether that claim is well founded we need not consider, as will presently appear. The new Charter was adopted on February 24, 1925; on that date certain sections of it, including Section 125, went into effect immediately; but the Charter as a whole did not become effective until April 10, 1926, and conse-quently did not displace the one of 1908 until that date. Section 125 just referred to is as follows:

"No person claiming to have been unlawfully removed or dis-charged from any office or position in the competitive class of the civil service prior to the first day of January, 1925, as the same ex-isted under the provisions of the charter of Kansas City, adopted August 4, 1908, shall in any event, be entitled to restoration to said office or position after February 24, 1925, nor as such officer or em-ployee, be entitled to any salary or compensation accruing after February 24, 1925.

"The fact that any person may have ceased the actual performance of the services or the discharge of the duties of any position by rea-son of any unlawful or invalid order of or attempt at removal or discharge shall constitute no exception to the provisions of this sec-

tion. The provisions of this section shall take effect upon the adoption of this charter.''

The adoption of this section on February 24, 1925, operated as an amendment of the Charter of 1908; it modified and supplemented the civil service provisions of that Charter, heretofore considered. The section, if a valid enactment, legislated out of office Pickett and others claiming to have been theretofore wrongfully removed.

Is Section 125 a valid legislative enactment? By the great weight of authority the power which creates a mere legislative office may, unless expressly restrained by some specific statutory or constitutional provision, remove the incumbent, not only by abolishing the office, but by an act declaring it vacant and making provision for the selection of his successor. [State ex rel. v. Davis, 44 Mo. 129; Attorney-General v. Jochim, 99 Mich. 358; Commonwealth v. Moir, supra; State ex rel. v. Hyde, 129 Ind. 296; Taft v. Adams, 69 Mass. 126; Bryan v. Cattell, 15 Iowa, 538; People v. Haskell, 5 Cal. 357.] For a statement of the reasons underlying such holding, we cannot do better than quote from a few of the many reported cases dealing with the legislative power in that respect.

''A mere legislative office is always subject to be controlled, modified, or repealed by the body creating it. In England, offices are considered incorporeal hereditaments, grantable by the crown, and a subject of vested or private interests. Not so in the American States; they are not held by grant or contract, nor has any person a private property or vested interest in them, and they are therefore liable to such modifications and changes as the law-making power may deem it advisable to enact. [3 Kent's Comm. (11 Ed.) 454, note c; 2 Washburn on Real Prop. 250; Primm v. Carondelet, 23 Mo. 22; Butler v. Pennsylvania, 10 How. 415; Smith v. The Mayor, 37 N. Y. 518; Conner v. The Mayor, 1 Seld. 285; People v. Warner, 7 Hill, 81, 2 Den. 272; Baker v. Utica, 19 N. Y. 326; Lynch v. Mayor, 25 Wend. 680; Devoy v. Mayor, 39 Barb. 169; Canniff v. Mayor, 4 E. D. Smith, 430.]''—State ex rel. v. Davis, supra, l. c. 131.

''The generally accepted American view is that eligibility to office is not a natural right inherent in a citizen, that an office is not a grant or a vested right arising from contract, that it is not property in the rigid sense that an ox or an ass or land is property. [Throop's Public Officers, sec. 119.] And such has always been the view of this court from Primm v. City of Carondelet, 23 Mo. 22 (1856), down to State ex inf. v. Evans, 166 Mo. 347 (1901). A public elective office is a public agency which, barring any constitutional inhibition, express or implied, may be abolished, curtailed or regulated by·legislative enactment.'' [State ex rel. v. Sheppard, supra, l. c. 509.

"The Legislature may remove officers, not only by abolishing the office, but by an act declaring it vacant, as was done by Act No. 140, Sec. 13, Laws of 1891. [Throop v. Langdon, 40 Mich. 673; Auditors v. Benoit, 20 Id. 184.] And it may lodge the power to remove from statutory offices in boards or other officers, subject to statutory regulations. And, while it cannot remove incumbents of constitutional offices, it is not because of an inherent difference in the qualities of the office, but because the power to remove is limited to the power that creates. The constitutional officer is an agent of the government. There is the same lack of the ingredients of contract, and the same power to abolish the office or remove the officer by amendment of the Constitution. [City Council v. Sweeney, 44 Ga. 463; Butler v. Pennsylvania, 10 How. 402. . . .]

"While in many cases the power of removal is a limited and restricted one, to be exercised along given lines and with prescribed formalities, as already stated, it is not by reason of an inherent right of property in the officer, bringing him within the protection of the Fourteenth Amendment, but because of the limitations of the law." [Attorney-General v. Jochim, supra, l. c. 368, 369, 373.]

"The power of the Legislature to shorten the term of a statutory office, so as to effect an incumbent, once conceded, it is not difficult to see that there is no limit to such power. If it may shorten the term of a three years' office to two years, it may fix the term at one year or at one hour. In other words, the length of time a particular person shall hold is absolutely within the discretion of the Legislature. . . .

"The effect of the act we are now considering was to put an end to the appellant's term of office, and to provide a new mode of selecting some one to discharge, at least some, if not all, of the duties theretofore discharged by the appellant, and that whether the office of state supervisor of oil inspection is to be regarded as a new office or an old office under a new name, the intention to produce this result is plain, both from the title of the act and from its provisions. In order to end the appellant's term of office we do not think it was necessary to abolish the office held by him. As it is a statutory office, it was within the power of the Legislature to end the term of the incumbent at any time, and make provision for the selection of a successor." [State ex rel. v. Hyde, supra, l. c. 302, 303.]

According to the authorities cited, and many others, an incumbent of a public office may be removed therefrom by the power which created the office, without violating any right guaranteed him by the Fourteenth Amendment of the Constitution of the United States or by any of the general provisions of either State or Federal Constitutions which have for their purpose the safeguarding of the rights of the citizen in respect to the enjoyment of life, liberty or property.

There was not, so far as we are advised, any specific statutory or constitutional provision which operated as an inhibition against the adoption of Section 125 as a part of their charter by the inhabitants of Kansas City. It must therefore be deemed valid and effectual.

How did Section 125 affect the Pickett case which was pending in the Circuit Court of Jackson County at the time of its adoption? The section did not upon its adoption operate retrospectively. [Secs. 7061, 7063, 7065 and 8861, R. S. 1919.] It did not therefore affect in any wise the rights which at that time had fully accrued to Pickett. It did, however, cut off his alleged continuing right to be restored to office, because it brought to an end his tenure of office; and his tenure having come to an end there could be no further accrual of salary in his favor. But the fact that Pickett's restoration to office is now precluded by Section 125 does not divest the circuit court of jurisdiction to proceed with the trial of the cause, and to award the plaintiff the other relief to which according to the averments of his petition he is entitled, namely, the salary of the office which accrued from the time of his removal up to February 24, 1925. In State ex rel. v. Walbridge, supra, a proceeding in mandamus to compel the restoration of an unlawfully removed officer and the payment of the accrued salary of the office, the relator's term of office expired during the pendency of the suit. But the fact that relator was no longer entitled to be reinstated in office was not thought to divest the court of jurisdiction to compel, *in that proceeding,* the payment of the salary that was due him. Section 7061, supra, which we deem applicable to the situation here, seems to put the matter entirely at rest. It provides:

". . .; nor shall any law repealing any former law, clause or provision be construed to abate, annul or in any wise affect any proceeding had or commenced under or by virtue of the law so repealed, but the same shall be as effectual and be proceeded on to final judgment and termination as if the repealing law had not passed, unless it be otherwise expressly provided."

III. The contention that the circuit court, in proceeding to hear and determine the Pickett case and the others referred to, is about to invade certain constitutional rights of Kansas City is based upon this allegation of relator's petition: "Dee Pickett and other discharged civil service employees rendered no service to the city after such discharge, but the city employed others who performed their work and were paid therefor; . . . to now compel such city to pay the said Dee Pickett and others is in violation," etc. With reference to Pickett, assuming the allegations of his petition to be true, the language of Brace, P. J., in State ex rel. v. Walbridge, supra, l. c. 203, is apposite:

**Payment of Salary to Another.**

"The legal right to the office carried with it the right to the salary. The board by its wrongful act could not deprive him of this legal right. The right of a public officer to the salary of his office, is a right created by law, is incident to the office, and not the creature of contract, nor dependent upon the fact or value of services actually rendered." Now no constitutional right of Kansas City can be violated by compelling it to pay to Pickett what is lawfully due from it to him. Relator's loss results from the payments made from its treasury, in violation of its organic law, to the person whom its agents attempted to install in Pickett's office. The result of that wrongdoing cannot, in either law or morals, be visited upon Pickett. And what is true as to Pickett is true as to others similarly situated. There is no substance in relator's contention that its constitutional rights are about to be invaded.

IV. Owing to the dire financial straits in which it is said Kansas City will be placed in the event that Pickett and others succeed in the mandamus suits which are pending against it, we have gone fully into the merits of the contentions of **Prohibition.** both parties to those suits to see, if perchance, any matter is involved in them which lies beyond the jurisdiction of the circuit court. We have found that the trial and determination of the cases will probably call for the construction of certain provisions of the Charter of 1908; the construction and constitutionality of Section 125 of the Charter of 1925; the effect of the adoption of the latter upon pending suits; and the constitutional questions raised by Kansas City with respect to its being required to pay a second time the salaries incident to the offices involved. The trial of the cases will also necessarily call for a judicial determination of the truth of the allegations contained in the petition in each case, and also the sufficiency of the defenses, if any, which may be interposed, such as acquiescence, estoppel or abandonment. Now it is clear that all of these matters fall within the competence of a court of general jurisdiction; as to mere mode of procedure, it is not suggested, nor does it appear, that the circuit court has in any respect departed from long-established paths. If therefore, it does all that relator says it has threatened to do, it will not have exceeded its lawful jurisdiction in any particular. If it commits error, an adequate remedy through appeal or writ of error will be available to relator.

And of course the circuit court will not exhaust its jurisdiction in the trial and determination of one case. Neither the number of cases pending nor the aggregate amount involved operates to limit its power.

Our provisional rule herein is discharged and the proceeding dismissed. *White* and *Atwood, JJ.*, concur; *Blair, C. J.*, concurs in

Paragraph IV and the result; *Walker, J.,* dissents in separate opinion, in which *Graves* and *Otto, JJ.,* concur. Leave to *Graves, J.,* to file a separate opinion.

BLAIR, C. J., (concurring).—I concur in Paragraph IV of the opinion of RAGLAND, J., and also concur in the result there reached. After my vote was so recorded, I have concluded to set forth my reasons for so voting.

In Paragraph IV, it is held that the circuit court has jurisdiction to hear and decide the case. Under such circumstances this court should not express or attempt to express its opinion upon the merits of the case or cases properly pending before respondents.

For that reason I have refrained from expressing any opinion upon the merits of the case or cases. Indeed, deeming it improper to express such an opinion, I have not undertaken to inform myself sufficiently to have any fixed opinion upon the merits of the questions involved.

WALKER, J., (dissenting).—This controversy arises out of a suit brought in the Circuit Court of Jackson County by one Dee Pickett, a former general clerk of the collection division of the Water Department of Kansas City, to compel, by mandamus, certain officers of that city to restore him to the clerkship formerly held by him, from which he claims he was illegally removed, and reinstate his name on the payroll of the employees of said city from and after the date, August 15, 1918, when he alleges he was illegally discharged, and to certify his name to the City Comptroller with a requisition upon the City Auditor to prepare and deliver to him a warrant for his salary, and to thereafter recognize him as the lawful general clerk of the collection division of the Water Department of said city. Pickett, in his capacity as a clerk of the Water Department, belonged to what is termed in the Charter of 1908, the classified service, in that he had been appointed after a competitive examination and held his position under the provisions of Section 10 of Article XV of said charter, the portions of same pertinent to the matter here under review being as follows:

"All appointments to positions and employments in the several departments of the city service shall, unless in this Charter otherwise provided, be made by the respective heads of such departments under and in conformity with the provisions of such rules, and such heads of departments shall respectively have power to remove or discharge any person holding any office, position, or employment in their respective departments whenever, in their opinion, the good of the public service requires the exercise of such power. It shall be the duty of a discharging officer, upon request of a discharged person, at any time after discharge to give such person a correct statement

316 Mo.—35.

in writing of the reasons for his discharge. No person in the city's service shall be removed, reduced in grade or salary, or transferred because of political or religious beliefs or opinions of such persons; nor shall any person in the competitive class of the city service be removed, reduced in grade or salary or transferred without first having received a written statement setting forth in detail the reasons therefor; and at the option of the person who shall have been removed, reduced, or transferred, a copy of such statement shall be filed in the office of the Civil Service Commissioners, together, with reply, if any made thereto, by the person removed, and the whole shall be filed and preserved in the office of said commissioners and be open to public inspection.''

Pickett contends that he received no notice of his discharge as required by Section 10, and as an employee of the classified service he was unlawfully removed and is entitled by mandamus to be reinstated in and restored to the position he held in that service and to have his salary as such employee paid to him by the city from the date of his discharge to the present time—whether at the rate he was being paid when discharged or at the increased rate he alleges was subsequently paid for like services to his successor is not stated. Thereupon the circuit court, July 10, 1923, issued its alternative writ of mandamus, commanding the persons named as respondents to do the things prayed for in the petition. The officers of the city named as respondents in the mandamus suit, after numerous delays in that proceeding, on May 22, 1926, applied for and were granted a preliminary writ in prohibition by the Supreme Court, alleging numerous reasons for the issuance of the same.

We are concerned here in determining, first, the power of the officer, board or head of the department in which Pickett was employed, to discharge him without complying with the requirement of Section 10, that he be notified of his discharge; and second, if discharged in violation of this requirement, is he entitled to a restoration to the position by mandamus and a payment to him, by the city, of the salary which would have been paid to him if not discharged?

I. The nature of the duties required to be performed by Pickett were of sufficient public concern to entitle him to be classified at least as a quasi-public officer. [State ex rel. Guion v. Miles, 210 Mo. 127.] As such, therefore, his rights are to be determined. The right to hold office is not a natural right, and apart from special constitutional provisions no one has a private right of property in a public office. [Gantt v. Brown, 244 Mo. 271; Gregory v. Kansas City, 244 Mo. 548; Taylor v. Beckham, 178 U. S. 548; Nichols v. McLean, 101 N. Y. 526.]

The office, therefore, is not the property of the holder; nor is it a vested right which, in the absence of a fixed tenure or other express legal inhibition, will prevent one from being removed therefrom, although appointed after a competitive examination. [Gregory v. Kansas City, supra.] The point has been stressed in contending that Pickett is entitled to be restored to the position formerly held by him, by reason of the manner in which he was selected and the fact that a provision of Section 10, of Article XV, required that he be notified of his discharge and that this, without more, confers in some manner not explained, the right to restoration and a payment of the salary he would have received if not removed. This contention embodies the assumption, in the absence of a provision in the charter authorizing an action for restoration, that a remedy may be had for a right which does not exist. A review of the civil service provisions of the Charter of 1908, will sufficiently define our views on this question. The purpose of a competitive examination under the civil service law is to prevent appointments to office through personal or political favoritism; and to substitute therefor a merit system. The elevation of the standard or the promotion of the efficiency of appointees is, it is true, one of the features of this system, but its controlling purpose is the betterment of the public service. Whatever rights, other than those enjoyed by persons holding positions under the general law, to which those may be entitled who hold positions under the merit system, must be determined from the civil service laws or ordinances under which the appointments were made. [People v. Kipley, 171 Ill. 44, 41 L. R. A. 775; People v. Mosher, 163 N. Y. 32; Rogers v. City of Buffalo, 123 N. Y. 173.] In the absence, inapplication or waiver therefore of the limitations in the civil service article (Art. XV, Charter 1908), it is the character of the tenure, as defined by the law, under which the position is held that is determinative of the rights of the holder thereto. Since the right to hold office is not a natural right or one guaranteed by organic law, the holder of same has no property interest therein, and it possesses none of the characteristics of a vested right, such as would prevent the appointing power from removing one holding a position under the civil service provision of the Charter of 1908. The right to hold the position to which Pickett asserts claim was created by the Charter. To this we must look in determining his right. This necessarily follows because of the absence of any inherent, vested or property right in him to the position. While his rights are to be determined by law it is the law creating the position and that alone which must be our guide. An examination of the charter having to do with the selection of employees under the Civil Service Act (Art. XV, Charter 1908), discloses that there is no express provision or any phrase, clause or sentence, which by reasonable implication under

the rules of construction, can be held to authorize one removed from a position, as in Pickett's case, to invoke mandamus or other coercive proceeding to secure restoration to such position and compensation during the time of such removal. On the contrary the framers of the charter, while recognizing the probable beneficial results that would accrue to the city by the selection of its employees by competitive examinations, also recognized the fact that while they might fix the tenure of said employees, define their compensation and provide for their restoration in the event of removal in violation of the prescribed limitations, they did not do so. In failing to do so and in expressly penalizing the city officials for improperly discharging employees the reasonable rule of interpretation must be applied that it was not intended that discharged employees should have the right to be restored to their positions and compensation. This conclusion accords with right reason as we view the facts. Had a fixed tenure, a right to restoration and compensation been prescribed it would have constituted a grant of power to employees which would have been purely unilateral. The city would have been bound by this grant while the employees would have been free to abandon their employment at will. However, it is not material to a proper determination of the matter at issue whether this was the reason for the omission from the charter of a provision for the restoration of employees discharged from the classified service. It is enough to say that it was omitted, and that it was an intentional omission is evident from the sections referred to, which prescribe the course that shall be pursued in the event of discharges from the service not in conformity with the limitations of the provisions of Article XV of the Charter of 1908. The facts demonstrate and the law declares that Pickett could have no legal interest in the position he had held of such a nature as to authorize him to maintain an action to be restored to the same. Having in law no right to or interest in the position, a failure to furnish him with a written statement in detail of the reasons for his removal cannot be construed as conferring such a right or investing him with such an interest. At most it was a violation of one of the requirements of Section 10, Article XV, for which the discharging officer rendered himself liable to the penal provisions of said article. To rule otherwise necessitates the conclusion that a removal by a discharging officer of an employee of the classified service, in disregard of one of the limitations of Section 10, creates in the person discharged such an interest in the position he held as to authorize him to institute an action for its recovery and the compensation incident to the same. To render such a construction even remotely possible it is necessary to read into the charter a provision authorizing such employees to sue for restoration. It is needless to say that no rule of interpretation authorizes such a procedure.

II.   The petition for mandamus sufficiently defined the petitioner's legal status and relation to the position he had held and to which he sought to be restored to apprise the circuit court of the facts in the case upon which the petitioner based his grounds for relief. These grounds stated no cause of action, nor were any facts expressed or which might be implied from those stated, which would enable a cause of action to be stated. In this state of the record the circuit court for this reason, as well as others to be stated later, should have declined to exercise jurisdiction and have refused to issue the alternative writ.   Not only, therefore, was no cause of action stated, but it was demonstrated by the averments made that none could be stated.   This being true, while the general jurisdiction of the circuit court in proceedings by mandamus is beyond question, where it is evident, as it was from the pleadings in this case, that no right of action existed for which a remedy could be granted, the attempted exercise of jurisdiction was a proper subject for the supervisory and prohibitive powers of this court.

This court in many well considered cases has held that where a plaintiff's petition fails to state a cause of action the court is without jurisdiction to proceed in the case even though it may have jurisdiction over the subject-matter.

Judge SHERWOOD, in Weil v. Greene County, 69 Mo. l. c. 286, thus discusses and disposes of this question: "None of the cases cited for plaintiff were those where the petition failed to 'state facts sufficient to constitute a cause of action.'   Where such a failure occurs, it is as fatal as the lack of jurisdiction over the subject-matter of the action, and, like that, may be taken advantage of, either in the lower court, or here, though no attention was called to the matter in the lower court."

The Weil case states the rule generally.   As more concretely applicable to the matter at issue the reasoning of FARIS, J., in State ex rel. Fenn v. McQuillin, 256 Mo. 705, is apposite as sustaining the conclusion that where a petition states no cause of action and it is clearly apparent that none can be stated prohibition will lie and should be granted by this court.   The language employed by the court in the Fenn case was as follows: "If in a proper case where the petition below was before us, we had from an examination of it found no jurisdiction in the court *nisi* to hear and determine the cause set out therein, and had found that no amendment could be made by which jurisdiction could be conferred; then we would not hesitate to make the preliminary writ herein permanent. . . . Before prohibition will lie on the ground of a lack of jurisdiction, the court below must have so ruled as to make manifest a claim of jurisdiction."   That claim was made manifest by the action of the trial court in the instant case.

III.   We have shown that the petition for mandamus upon which and in accord with which the alternative writ was issued not only states no cause of action, but upon the issue attempted to be made no cause of action can be stated.  This, as we have demonstrated, will authorize the exercise of the prohibitive power of this court.   Other reasons supplemental perhaps to that stated, but nevertheless potent in determining the duty of the Supreme Court, may not inappropriately be stated.   The moving purpose of the trial court's action, as disclosed by the petition and the alternative writ, was the restoration of Pickett to his former position.   This in the absence of a law constitutional, statutory or municipal, cannot be done.   Compensation is but an incident to restoration.   If no right exists for the latter, no remedy can be afforded for the former.   Mandamus, as has been graphically stated, is a hard-and-fast writ; coercively compelling in its nature, it is mete therefore that a trial court, cognizant from the pleadings of the lack of authority for its issuance, should, like Agag before Samuel, "move delicately" before acting.   In short, no power existing to act upon the application for restoration, none can be invoked to compel compensation.   [St. Louis County Court v. Sparks, 10 Mo. 117; Selby v. Portland, 14 Ore. 243, 58 Am. Rep. 307; 19 R. C. L. p. 940, sec. 240.]

Another reason not to be overlooked as supplementing the Supreme Court's power to stay this proceeding is the lack of timeliness in applying for this writ.   Almost five years elapsed between the date of Pickett's discharge and his application by mandamus for restoration.   This delay, alone patently apparent upon the record, should have prompted the trial court to refuse to issue the alternative writ.   Whatever protest he may have made at the time of his discharge is immaterial, in the face of the fact that for years thereafter he contented himself with inert indifference to any claim he might have made for restoration.   It does not matter, it is true, that his timely action would not have added an iota to the legal strength of his claim; if timely it would at least have given the trial court ground for the presumption that the action was in good faith for the establishment of what the petitioner believed to be a right.   The course pursued left the trial court no ground for this presumption.   One discharged from a position for whatever reason, who makes no effort to secure restoration thereto, but who sits idly by or seeks and pursues another vocation until years have elapsed should be held, if no stronger reason existed, to have abandoned any claim he may have had to the position.   This evident abandonment, while not furnishing in itself grounds for prohibitive action by this court, should, with the other supplemental reasons to that of a lack of cause of action, have stood out as a datum post to warn the trial court against its abuse of jurisdiction in the issuance of the alternative writ.   [Cote v. Biddeford,

96 Me. 491, 90 Am. St. Rep. 417; People v. Police Board, 174 N. Y. 450, 95 Am. St. Rep. 596.] If a discharged employee, whether in the general employment or in the classified service of the city, be permitted by the courts to successfully pursue a like Fabian policy in prosecuting a claim against the municipality and no limit is placed upon the time within which such claims may be prosecuted, suits as stale as the subject of bimetallism and as numerous as fakers at a country fair will throng the courts of the city to the obstruction of their legitimate business. Nothing can be more sacred than public funds, national, state, or municipal; wrung from the people by taxation, they should be expended for the purpose for which they were collected, viz: the maintenance of the body politic and the general welfare of the people. If every Carker who at sometime has been in the city's employ and who claims to have been improperly removed therefrom is permitted by the court, in the absence of a cause of action, and after years of complacent indifference and a change has been wrought in the organic law of the city, to institute and maintain an action for restoration to the position he once held and compensation during the years that have elapsed, the taxes now imposed for the support of the municipal government will be inadequate to meet demands of this character of claims alone.

IV. Another fact of more than passing importance exists which should have caused the trial court to refrain from assuming jurisdiction in this case. It is this, the impossibility of the trial court entering a judgment which would have rendered the writ of mandamus effective. It is conceded that the right to prosecute an action of this character was foreclosed upon the adoption of Section 125 of the Charter of 1926. If it be granted, as it may be, on account of the time when Pickett brought this suit, that whatever rights he then had are to be adjudicated under the Charter of 1908, the adoption, during the pendency of the suit, of the new charter containing Section 125, had the legal effect to abolish the position to which Pickett now asserts a claim. If therefore a peremptory writ be issued herein there remains nothing upon which it can act. Under such circumstances a judgment of restoration would be a nullity. This is true because the peremptory writ must follow the alternative writ and must be enforced in the terms under which the latter was issued or not at all. There is no halving of remedies in the rendering of a judgment of this character. [School Dist. v. Lauderbaugh, 80 Mo. 190; State ex rel. v. Police Comsnr., 80 Mo. App. l. c. 219, and cases; State ex rel. Porter v. Hudson, 226 Mo. l. c. 264, and cases.] Courts when confronted with facts similar to those at bar, have ruled that where the office has been abolished from which a party has been removed, he is not entitled to mandamus to restore

him to the same. [Hill v. Boston, 193 Mass. 569; Breckenridge v. Scannell, 160 N. Y. 103; People ex rel. v. Bermel, 51 Misc. (N. Y. Supp.) 75; People ex rel. v. Ennis, 18 N. Y. (App. Div.) 412.]

V. Latitude in the discussion of the Supreme Court's right to prohibit the actions of lower courts when abusing their jurisdiction has been indulged in because of the great importance of a just, correct and hence a right determination of the question at issue. Without intending a lack of respect for the opinions of those who may differ from the conclusions here reached, it may be finally said if the facts in this case do not disclose a clear and unequivocal abuse of jurisdiction on the part of the trial court then none can exist under any possible state of facts. This being true the preliminary writ of prohibition should be made absolute.

A critical review of the cases in which restorations to office have been sustained or rights to compensation therein have been recognized will disclose in each instance that the proceeding was sanctioned, either by a constitutional, a statutory or a charter provision. We except from this category the Hamilton case, 259 S. W. (Mo.) 1045, the Prior case, 261 S. W. (Mo.) 112, and the Langford case, 261 S. W. (Mo.) 115, in which opinions were rendered by Division One of this court, which in so far as they ignore the governing rule in cases of this character and thus impliedly overrule the Gregory case, 244 Mo. 548, which asserts the law correctly, are not in accord with the current of decisions here and elsewhere.

A rule absolute should therefore be made prohibiting further action by the trial court in the mandamus proceeding. *Graves, J.*, concurs in this opinion and reserves the privilege of giving further reasons why the Hamilton case should be overruled; *Otto, J.*, concurs.

### ON MOTION FOR REHEARING.

RAGLAND, J.—Relator insists that it is entitled to a rehearing for the reason, among others, that our original opinion herein is contrary to the overwhelming weight of authority to the effect that payment to a *de facto* officer of the salary incident to the office is a complete defense to an application of the *de jure* officer, upon his restoration to office, for mandamus to compel the payment of the salary to him. The efficacy of such defense was not considered, because not raised by either pleading or brief on behalf of relator. The contention was, that to compel Kansas City to pay Pickett and others for services which they had not performed, but which had been performed by others who had been paid therefor, would violate designated provisions of the State and Federal Constitutions; and all that is said in Paragraph III of the opinion is with reference to that

contention. We still adhere to the views there expressed touching the alleged constitutional questions.

The question now raised is whether payment to a *de facto* officer of the salary incident to the office, during the time he is in possession of the office and discharging all the duties thereof, is a defense to a suit by the *de jure* officer, upon his restoration to office, to recover the same salary from the municipality, county or state, as the case may be. This precise question, so far as we have been able to ascertain, has never been passed upon by this court. The earliest case in which we find any direct reference to it is State ex rel. v. Clark, State Auditor, 52 Mo. 508. That was a suit in mandamus to compel the State Auditor to issue a warrant for salary to an officer whose right to the office had been called in question by a pending proceeding in *quo warranto* instituted by the Attorney-General. The Auditor's refusal to issue the warrant was based on a statute which made it the duty of the Auditor, when an office was contested by two or more persons claiming a right thereto, to withhold salary warrants, unless the contestee gave bond to the contestor, conditioned that if, upon a final determination of the rights of the contestants, the obligor was found not entitled to the office, he would pay over to the obligee the amount of salary, etc. The matter in decision was the proper construction to be put upon the statute, but in the course of the opinion it was said:

"It is also insisted that, as the primary object of the act was to protect the Treasury against what is claimed to be unjust and illegal demands, it therefore applies to a contest by the State, as well as to a contest by an individual. This view results from the erroneous assumption, that the State would incur a double liability if the proceeding now pending against the relator should result in ousting him from the office, and that he is not entitled to the salary received in the meantime. The commission issued to the relator invested him with the title, and is prima-facie evidence of his right to the office. It gave him the possession and the power to exercise its functions, of which he could be deprived only on due process, in the manner prescribed by law. [State ex rel. Vail v. Draper, 48 Mo. 213.] He alone is entitled to the emoluments of the office, until the State, by a proper proceeding, has revoked the authority with which it has invested him. Meanwhile the auditor cannot rightfully withhold the salary. There could therefore be no legal claim against the State for the salary so paid on the part of one who might hereafter establish a better right to the office. His recourse, if he has any, would in such case be against the relator, not the State. [Auditor of Wayne Co. v. Benoist and the authorities there cited, 20 Mich. 176; Hunter v. Chandler, 45 Mo. 452.]"

In State ex rel. Chapman v. Walbridge, 153 Mo. l. c. 203, it was said: "The legal right to the office carried with it the right to the salary. The board by its wrongful act could not deprive him of this legal right. The right of a public officer to the salary of his office is a right created by law, is incident to the office, and not the creature of contract, nor dependent upon the fact or value of services actually rendered." This language was used in passing upon the contention that the relator, who had been wrongfully removed from the office of policeman by the Board of Police Commissioners of the City of St. Louis, had after his removal rendered no actual services and had not offered to do so.

In Gracey v. St. Louis, 213 Mo. l. c. 397, we find this: "Here plaintiff was not 'removed,' as that term is understood in the law. What was done was not legally done and therefore had no legal effect. Another was assigned his duties and that other was paid by the city. That was the city's affair, if it chose to take such course with its attending consequences. Plaintiff remained in office, and the point is controlled by the general proposit'on of law that his right to the salary during his term, until legally removed, was independent of his actual performance of any duties whatever."

In that case the plaintiff had been wrongfully removed as inspector of boilers and the specific language just quoted was used in discussing and passing upon the defendant's contention that plaintiff had "abandoned his office; resigned by acquiescing in his removal, taking no steps to oust his successor, try title, etc."

In State ex. rel. Hamilton v. Kansas City, 303 Mo. l. c. 74-5, the foregoing excerpts from the Chapman and Gracey opinions were quoted approvingly, but in answer to "the *argument* that relator has not performed the duties of the office since his removal, and that another has done so and has been paid for so doing."

In none of the cases to which reference has just been made does it appear that the question, whether payment to a *de facto* officer constitutes a defense *pro tanto* to a suit by the *de jure* officer to recover the salary which accrued during the time the latter was deprived of the office, was considered or passed upon.

According to the overwhelming weight of authority elsewhere: "Disbursing officers charged with the duty of paying official salaries have, in the discharge of that duty. a right to rely upon the apparent title of an officer *de facto*. and to treat him as an officer *de jure*, without inquiring whether another has the better right; and payment of the salary of an office to a *de facto* public officer, made while he is in possession. is a good defense to an action brought by the *de jure* officer to recover the same salary after he has acquired or regained possession: Shaw v. Pima County, 2 Ariz. 399; Board of Commrs. of El Paso County v. Rhode, 41 Colo. 258; Coughlin v. McElroy, 74

Conn. 397; Saline County Commrs. v. Anderson, 20 Kan. 298; Bradley v. City of Georgetown, 118 Ky. 735; Walters v. City of Paducah (Ky.), 123 S. W. 287; Wayne County Auditor v. Benoist, 20 Mich. 176; Parker v. Board of Supervisors of Dakota County, 4 Minn. 59 (Gil. 30); State v. Clark, 52 Mo. 508; State v. Milne, 36 Nebr. 301; Dolan v. City of New York, 68 N. Y. 274; Terhune v. City of New York, 88 N. Y. 247; Demarest v. New York, 147 N. Y. 203; Chandler v. Hughes County, 9 S. D. 24; Samuels v. Town of Harrington, 43 Wash. 603.''

For a statement of the underlying reasons for the rule we quote at length from Dolan v. City of New York, supra, a leading case:

''We are of opinion that payment to a *de facto* public officer of the salary of the office, made while he is in possession, is a good defense to an action brought by the *de jure* officer to recover the same salary after he has acquired or regained possession. . . .

''If fiscal officers, upon whom the duty is imposed to pay official salaries, are only justified in paying them to the officer *de jure,* they must act at the peril of being held accountable in case it turns out that the *de facto* officer has not the true title; or, if they are not made responsible, the department of the government they represent is exposed to the danger of being compelled to pay the salary a second time. It would be unreasonable, we think, to require them, before making payment, to go behind the commission and investigate and ascertain the real right and title. This, in many cases, as we have said, would be impracticable. Disbursing officers, charged with the payment of salaries, have, we think, a right to rely upon the apparent title, and treat the officer who is clothed with it as the officer *de jure,* without inquiring whether another has the better right.

''Public policy accords with this view. Public offices are created in the interest and for the benefit of the public; such, at least, is the theory upon which the statutes creating them are enacted and justified. Public and individual rights are, to a great extent, protected and enforced through official agencies, and the State and individual citizens are interested in having official functions regularly and continuously discharged. The services of persons clothed with an official character are constantly needed. They are called upon to execute the process of the courts and to perform a great variety of acts affecting the public and individuals. It is important that the public offices should be filled, and that at all times persons may be found ready and competent to exercise official powers and duties. If, on a controversy arising as to the right of an officer in possession, and upon notice that another claims the office, the public authorities could not pay the salary and compensation of the office to the *de facto* officer, except at the peril of paying it a second time, if the

title of the contestant should subsequently be established, it is easy to see that the public service would be greatly embarrassed and its efficiency impaired. Disbursing officers would not pay the salary until the contest was determined, and this, in many cases, would interfere with the discharge of official functions.

"It is well settled that the acts of an officer *de facto* are valid so far as they concern the public or the rights of third persons who are interested in the things done. [People v. Hopson, 1 Den. 574, and cases cited.] 'Society,' says BRONSON, C. J., in that case, 'could hardly exist without such a rule.' The principle is, that those dealing with officers clothed with an apparent title should be protected, and that they should not be compelled to go beyond that and trace the title to its source. The case of the government paying a salary to an officer *de facto* is, we think, within the same protection, and that such payment is a defense to an action by the officer *de jure* against the officer or body charged with the duty of paying salaries to recover it. This does not deprive the person who has been wrongfully deprived of his office of a remedy. He may recover his damages for the wrong against the usurper; and the amount of salary, if not the fixed measure, may be considered by the jury in assessing the damages."

And the rule applies in suits for salary by persons in the civil service who have been wrongfully deprived of their offices just as it does in the case of suits by other *de jure* public officers. [People v. Schmidt, 281 Ill. 211; State ex rel. v. Shook, 283 Ill. 124.]

In this State a *de facto* officer, that is, one in possession of the office and discharging all the duties pertaining thereto, under color of right, can compel by mandamus the payment of the salary incident to the office; and in such proceeding his right and title to the office cannot be inquired into. [State ex rel. v. Gordon, 236 Mo. 159; State ex rel. v. John, 81 Mo. 13; State ex rel. v. Clark, supra; State ex rel. v. Draper, supra; Hunter v. Chandler, 45 Mo. 457; Dickerson v. City of Butler, 27 Mo. App. 9.] If therefore the person who was appointed to succeed Pickett *was a de facto officer,* he could, so long as he continued to be a *de facto* officer, have compelled the disbursing officers of Kansas City to pay the salary of the office to him, notwithstanding they might have had every reason to believe that Pickett had been wrongfully removed. Could Pickett then stand by during such time—he waited five years it appears—and then compel the city to pay the same salary to him? If he and the two or three hundred others could, and can do that, then there is just ground for the apprehensions, amounting almost to hysteria, which have been manifested here and there on the part of official Kansas City.

Some of the cases hold that, in order for payment of salary to a *de facto* officer to absolve the municipality, county or state from lia-

bility to the one legally entitled to the office, such payment must be made in good faith. This qualification is well enough, if by it is meant that the government cannot relieve itself of liability to the *de jure* officer by payment of salary to a mere interloper who has intruded himself into the office without any color of right; or to a *de facto* officer after it has been judicially determined that he is not also the *de jure* officer. [Jones v. City of Buffalo, 178 N. Y. 45.] Nor can fault be found with the decision of the Kansas City Court of Appeals in Luth v. Kansas City, 203 Mo. App. 110, *on the facts of that case,* that payment of salary to a *de facto* officer is not a defense to a suit by the *de jure* officer, where such payment was made during the pendency of a proceeding to determine the title to the office, and in bad faith for the purpose of forestalling the decision of the court therein. But for the reasons pointed out in the preceding paragraph mere knowledge on the part of disbursing officers that a third person is claiming title to an office should not prevent payment to a *de facto* officer from effectually discharging the municipality's liability for salary.

However, the defense which we have just been considering, if it exist, is one which must be pleaded and proved in each individual case in order to be available. Its potential existence does not deprive the circuit court of jurisdiction, and for that reason cannot be made a ground for prohibition here.

Other matters urged in connection with the motion for a rehearing have been heretofore fully considered and passed upon.

The motion is overruled. *White* and *Atwood, JJ.,* concur; *Graves* and *Walker, JJ.,* concur in part and dissent in part in a separate opinion by *Graves, J.; Blair, C. J.,* concurs in overruling motion for rehearing; *Gantt, J.,* not sitting.

### OPINION UPON MOTION FOR REHEARING.

GRAVES, J.—Upon consideration of the original opinion by Judge RAGLAND and the dissenting opinion by Judge WALKER, I concurred in the dissenting opinion, and reserved the privilege of writing further views. Judge RAGLAND's opinion upon motion for rehearing has simplified matters somewhat, and really makes the question of remedy the vital question. I concur in that part of the opinion written upon the motion for rehearing which rules that if the municipality has, in good faith, paid the salary to the *de facto* officer, such payment is a complete defense to an action against the municipality by the *de jure* officer. This was the early rule in Missouri, and I do not believe that the later cases, relied upon by respondent, when the facts are considered, undertake to change the rule. But, be that as it may, the weight of well-reasoned cases is

against the rule contended for by the claimant (plaintiff in the lower court) in this case, and if the latter cases establish such a rule they should not be longer followed. I understand the opinion upon the motion, to rule that payment to the *de facto* officer, if made in good faith, is a complete defense to an action by the *de jure* officer for the salary. It rules further, however, that the question is not pleaded and hence not in the present case. Of this question later.

II. I had intended, when I dissented, to discuss the status the claimant occupied with the city, under the charter, and the question whether or not he was an officer at all, as well as another question or two, but in view of the modified opinion upon the motion for rehearing, I shall discuss only the question of whether or not prohibition is the remedy.

III. I do not agree to that portion of the present opinion that rules prohibition will not lie in this case. Hence, notwithstanding the concurrence as to part of the opinion, I dissent as to the ruling that prohibition is not the proper remedy, and the result of the opinion.

My views of the Hamilton case were much shaken by the argument in this or a companion case. But this is adrift and foreign to the question now in hand.

It is said that the question of payment to the *de facto* officer as a defense to the action by claimant is not pleaded. The exact words are not used in the pleading, but facts are stated from which the charge of payment as a defense may be fairly inferred. The pleader says that to require this second payment to claimant would violate the Constitution, so that we have the fact pleaded of an unlawful demand for a repayment of a claim, already paid. This is a fair inference to be drawn from the language used.

I think the question is fairly lodged in the case, but the opinion does not stress this point, but goes further and rules that even had it been pleaded, yet our preliminary rule should be quashed, on the ground that prohibition would not lie in the case. So we have the direct issue. In so ruling my learned brother overlooks a long line of cases in Missouri. These cases are to the effect that prohibition *will lie, and is the proper remedy* in all cases where appeal, writ of error, or other remedies are wholly inadequate and would be oppressive. [State ex rel. v. Jones, 274 Mo. l. c. 394 et seq.; State ex rel. v. Elkin, 130 Mo. l. c. 109; State ex rel. v. Aloe, 152 Mo. l. c. 483; State ex rel. v. Eby, 170 Mo. l. c. 526.] These are some of the cases. In the Jones case, supra. they will be found cited, and excerpts (to the point in hand here) given.

In this case it is clearly charged that there are now pending three hundred cases in which the same question is involved, i. e. that payment has been made to *de facto* officers, and to compel another payment (by mandamus) to the *de jure* officer, would be unlawful. The status of the cases is not seriously questioned. The facts of this case brings it squarely within the rule of the cases, supra.

It would be oppressive and wrong to require the city to defend in these three hundred cases, and then appeal. Even the trial expense would be enormous. No remedy, save and except prohibition, would be at all adequate. Even if the pleading here is not as clear as it should be, to use that as a reason for refusing our writ, would mean for the city to go back and amend the pleadings, stating in plainer terms the fact of payment as a defense, then to make a new application here for a writ, to place before us the ultimate question as to whether the writ should go under the facts. The opinion rules that it should not issue even though payments were duly pleaded.

Under the line of cases cited, supra, that ruling is wrong. The Jones case is the latest on the question. For these reasons I dissent as to the result of the opinion. *Walker, J.,* concurs herein.